IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

03 FEB 14  PM 2: 38

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
FEB 14 2003

STANLEY REYNOLDS,                    )
                                     )
        Plaintiff,                   )
                                     )
v.                                   )      Civil Action No.: 02-PT-1901-E
                                     )
RONNIE WATKINS FORD, INC.;           )
RONNIE WATKINS d/b/a                 )
RONNIE WATKINS FORD, INC.; and       )
RONNIE WATKINS, Individually;        )
                                     )
        Defendants.                  )

## MEMORANDUM OPINION

This cause comes on to be heard upon defendants' Motion for Summary Judgment, filed

on December 16, 2002.

## FACTS AND PROCEDURAL HISTORY[1]

Defendant Ronnie Watkins Ford, Inc. ("Ronnie Watkins Ford"), is a new and used car

dealership, located in Gadsden, Alabama.  Defendant Ronnie Watkins ("Watkins") is the

president and an owner of Ronnie Watkins Ford.[2]  Plaintiff Stanley Reynolds ("Reynolds"), who

is African American, began working for Ronnie Watkins Ford on or around February 2000.

Reynolds contends that he was one of three African American employees out of a workforce of

approximately 45.  *See* Pl. Ex. 1, depo. exhibit 1.  In this lawsuit, brought pursuant to Title VII

and 42 U.S.C. § 1981, Reynolds alleges that he was discriminated and retaliated against because

---

[1]The Statement of Facts and the recitation of the parties' arguments may overlap somewhat.

[2]As will be discussed below, defendants contend that neither Watkins nor defendant Ronnie Watkins d/b/a
Ronnie Watkins Ford, Inc. is subject to suit under Title VII or § 1981.



of his race, and that defendants maintained a hostile work environment.[3]

## I. FACTS UNDERLYING REYNOLDS' CLAIMS

### Claim One: Hostile Work Environment - Reynolds Subjected to Racial Slurs

#### A.  Incident One

In May of 2000, Reynolds and fellow employee Chris Stewart were watching mechanic Devin Baugh ("Baugh") work on a car.  *See* Def. Ex. 1 at 65.  Baugh commented that "some nigger went and rigged everything up on" the car.  *See* Pl. Ex. 2 at 65.  Reynolds did not complain to any supervisor or managerial employee about the alleged incident, but reasoned that he "didn't have to complain to anybody since the supervisor [Chris Stewart] was standing there, and he heard what was said."  *See* Def. Ex. 1 at 70; Pl. Ex. 2 at 70.  Reynolds contends that service department supervisor Kenny Noojin came up to him and apologized for the remark and stated that he would try and make sure it did not happen again.  *See* Def. Ex. 1 at 70; Pl. Ex. 2 at 70.  Reynolds contends that there is no evidence that Chris Stewart or anyone else ever investigated the claim or filed any report.

By contrast, defendants note that Baugh did not even start working at Ronnie Watkins Ford until August of 2000.  *See* Def. Reply Ex. 1 at ¶ 4.  Moreover, Chris Stewart was employed as a service advisor, not in a supervisory capacity.  *Id.* at ¶ 3.  Defendants also note that after employee James Malone was terminated,[4] Reynolds applied for the vacant position of detail shop manager.  *See* Def. Ex. 1 at 62-64, depo. exhibit 3.  In a November 6, 2000 letter written to Watkins, Reynolds stated that he wanted to continue working at Ronnie Watkins Ford, and that

---

[3]In addition to damages, Reynolds seeks attorneys' fees pursuant to the Civil Rights Attorney's Fee Award Act, 42 U.S.C. § 1988.

[4]Malone, an African American, was apparently terminated for physically assaulting another employee.

he felt that he had the respect of the people who worked around him. *Id.* Reynolds also expressed gratitude for an upcoming employee party. *Id.* Watkins did not fill the vacancy prior to Reynolds' termination. *See* Def. Ex. 1 at 48-49. Defendants assert that the position was ultimately filled by Billy Horton ("Horton"), an African American employee. *See* Def. Ex. 4 at ¶ 5; Ex. 5 at ¶ 5.

### B. Incident Two

In December 2000, Reynolds alleges that, while he was attending an employee party, Baugh and another employee, Dewayne Franklin, made racially offensive comments to him. *See* Def. Ex. 1 at 65-66, 73; Pl. Ex. 2 at 66-76. According to Reynolds, the comments included statements that "we've got a darkie in the corner," "Stanley, after everything is done, we want you to clean up," "we've got a spot on our table," and "we've got some pepper in our salt." *Id.* at 65-76. These were the only statements that Reynolds could remember. *Id.* at 74-75. Reynolds contends that the statements were made in front of Brian Payne, a management employee. *See* Pl. Ex. 2 at 75.

Watkins, after learning that Reynolds was upset,[5] sent for Reynolds to find out about the incident. *See* Def. Ex. 1 at 78. After learning what had happened,[6] Watkins told Reynolds that he would talk to Baugh and Franklin to see that it did not happen again. *Id.* at 80; Def. Ex. 2 at 61, depo. exhibit 13. Baugh and Franklin told Watkins that Reynolds had participated in the "joking," *see* Def. Ex. 2 at 61, depo. exhibit 13, although Reynolds denies that he participated in

---

[5]Defendants contend that Reynolds did not complain about the incident. *See* Def. Ex. 1 at 78; Ex. 2 at 60-62.

[6]Watkins did testify that he knew that Reynolds was upset and had left the party before dinner was served. *See* Pl. Ex. 1 at 59-60.

3

the name calling. *See* Def. Ex. 1 at 78; Pl. Ex. 2 at 78. Watkins told Baugh and Franklin that this type of conduct would not be tolerated. *See* Def. Ex. 2, depo. exhibit 13. However, Reynolds contends, there is no evidence that either employee was written up, although the incident was documented in his file. *See* Pl. Ex. 1 at 62-66.

    C. <u>Incident Three</u>

Reynolds also complains of another incident at the same December 2000 employee party. Reynolds contends that employee Jaurus Rawles ("Rawles"), an African American, wore an "Afro" wig to the party and was making racial gestures. Defendants assert that Reynolds never complained about the situation. However, Watkins was present and witnessed Rawles' conduct. *See* Pl. Ex. 1 at 56-57. Watkins testified that he was "obviously taken aback" by Rawles' conduct, but that he did not stop him because he "thought to say anything would embarrass him." *Id.* at 56-58. Watkins later testified that the situation "was out of my . . . I didn't have control." *Id.* at 59-60. Reynolds later testified that Watkins told him that there was nothing he could do about the situation, and that it was in Reynolds' best interests to forget about it and "sweep this under the rug." *See* Pl. Ex. 2 at 66-67. Watkins admitted that he did not interview anyone about the incident until after the EEOC investigation had begun. *See* Pl. Ex. 1 at 70.

    D. <u>Incident Four</u>

Finally, on or around February 28, 2001, Reynolds was walking into work with a toboggan on his head when Baugh asked "aren't you supposed to wear that toboggan pulled down over your face like the other darkies who go around robbing people?" *See* Def. Ex. 1 at 66; Pl. Ex. 2 at 66. According to Reynolds, the other mechanics in the room at the time acted as if they did not approve of what Baugh had said. *See* Pl. Ex. 2 at 83. Reynolds did not complain

4

to anyone about the incident on the day that it happened.  However, there is some dispute as to
whether Reynolds eventually went to see Watkins about this event, or whether Watkins sought
out Reynolds about a different matter.  *See* Def. Ex. 1 at 84.  Reynolds testified that he was on
the way to see Watkins on March 1, 2001, the day that he was terminated, when he was told that
Watkins needed to see him.  Reynolds contends that, after he told Watkins about the incident,
Watkins told him that "[r]acism doesn't exist," that "[i]t's people like (you) that keep stuff going
all the time," and that Reynolds was born black, was going to die black, and just needed to deal
with it.  *See* Pl. Ex. 2 at 84-89.

**Claim Two: Disparate Impact/Treatment - Reynolds' Termination**

When Reynolds was hired, he was hired for the position titled "clean-up."  Reynolds
contends that the next individual hired for the position titled "clean-up" was Charles Reavis, a
Caucasian, who was hired on March 3, 2001, two days after Reynolds was terminated.  *See* Pl.
Ex. 1, depo. exhibit 1.  Defendants contend that Reynolds was replaced by Horton, and that, as
noted above, Horton was eventually promoted to fill Malone's job.  *See* Def. Ex. 4 at ¶ 5; Def.
Ex. 5 at ¶ 5.  However, Reynolds points out that Horton was hired on February 21, 2001, a date
prior to when Reynolds was terminated.  *See*  Pl. Ex. 1, depo. exhibit 1.  Reynolds also notes that
Horton's job position on that exhibit was listed as "Manager-Clean Up."

**Claim Three: Disparate Impact/Treatment - Maintaining Employee Database**

Reynolds contends that Ricky Cornelius ("Cornelius"), the controller at Ronnie Watkins
Ford, maintained a database that listed the race of every employee at Ronnie Watkins Ford, Inc.
*See* Pl. Ex. 3 at 60-63; Ex. 1, depo. exhibit 1.  Defendants contend that the information was kept
for the purpose of certain forms that must be supplied to the State of Alabama.  *See* Pl. Ex. 3 at

63. Reynolds disputes whether such forms exist.

**Claim Four: Disparate Impact/Treatment - Enforcement of Employee Handbook**

As will be discussed more fully below, defendants contend that Reynolds was terminated for, primarily, telling lies with regards to himself and co-employee Billy Stewart. *See* Pl. Ex. 1 at 124-27. Defendants' Employee Handbook prohibited "Fraud, Dishonesty, and False Statements." *See* Pl. Ex. 1, depo. exhibit 2. Reynolds contends that employees were entitled to a warning before being terminated, but that he was never given a warning about making false statements. *See* Pl. Ex. 1 at 130, 200. Moreover, Reynolds asserts, there is no evidence that any other employee was ever disciplined for violating that particular policy.

**Claim Five: Disparate Impact/Treatment - Placing a "Write-Up" In Reynolds' File**

Reynolds notes that the incident at the employee party in December 2000 was documented in his permanent employee file. *See* Pl. Ex. 1, depo. exhibit 13. Watkins testified that he was not sure whether or not he placed anything in the files of the employees who made the remarks. *See* Pl. Ex. 1 at 64-66.

**Claim Six: Retaliation - Termination for Complaining About Racial Slurs**

Reynolds notes that he was discharged on the same day that he complained about the fourth and final racial slur. *See* Pl. Ex. 1 at 66-81.

**Claim Seven: Retaliation - Altering Reynolds' Employee File After Discharge**

Reynolds notes that the EEOC came to Ronnie Watkins Ford to investigate the charge of race discrimination. Watkins admitted that after the EEOC began its investigation, he added information to the entry in Reynolds' employee file that was originally made the day Reynolds was terminated. *See* Pl. Ex. 1 at 138, depo. exhibits 4-5.

## II. FACTS UNDERLYING REYNOLDS' TERMINATION

On or about February 22, 2000, Reynolds came to Ronnie Watkins Ford to apply for a job detailing cars. *See* Def. Ex. 1 at 37-38. Reynolds met directly with Watkins. *Id.* at 37-38. Watkins spoke with Reynolds about the job, and after calling a friend who was a relative of Reynolds, hired Reynolds on the spot. *Id.* at 39-40. Watkins asserts that he was exclusively responsible for the decision to hire Reynolds. *See* Def. Ex. 4 at ¶ 2.

After only a few weeks on the job, Reynolds took time off from work to interview for a position with the United States Postal Service. *See* Def. Ex. 1 at 53; Pl. Ex. 2 at 53. Watkins spoke with Reynolds about taking time off of work to interview for another job. *See* Def. Ex. 2 at 98, depo. exhibit 13. During his deposition, Reynolds acknowledged that leaving work to interview for another job could "possibly" indicate how dedicated he was at his job. *See* Def. Ex. 1 at 57. However, Reynolds asserts that this event happened over a year before he was terminated, that the event never really bothered Watkins, and that he had permission to leave work. *See* Pl. Ex. 1 at 101, 130-32, 200-05.

During the course of his employment, Reynolds briefly worked in the service department. *See* Def. Ex. 1 at 51-52. While Reynolds was working with the service department, Chris Stewart, a service advisor, complained to Watkins that Reynolds had taken a customer's car to McDonald's and was gone for over forty-five minutes. *See* Def. Ex. 2 at 89-90, depo. exhibit 13. Watkins asserts that he warned Reynolds that such behavior was unacceptable. *Id.* However, Reynolds denies that he ever took a car to McDonald's, or that anyone ever talked with him about such an allegation. *See* Def. Ex. 1 at 62. Reynolds was eventually moved back to the detail shop. *See* Def. Ex. 1 at 52.

7

Reynolds was also observed by Ricky Cornelius ("Cornelius"), the controller at Ronnie Watkins Ford, inappropriately using the company phone for personal calls. *See* Def. Ex. 3 at 14-16, 18-22. After discussing the matter with Watkins, Cornelius, on April 11, 2000, met with Reynolds to warn him about excessive phone use. *Id.* at 18-22. Cornelius documented the conversation in Reynolds' personnel file. *Id.* at 18-22; Def. Ex. 2, depo. exhibit 3.

When Reynolds started working at Ronnie Watkins Ford, he was paid $7.00 per hour, plus a commission based upon the number of cars inspected. *See* Def. Ex. 1 at 40-41. During the course of his employment, Reynolds received a raise to $7.50 per hour and a raise in his commission. *Id.* at 42-43. Despite the raise, Reynolds continually came to Watkins and asked for more money. *See* Def. Ex. 2 at 74, 120. Watkins told Reynolds that he could not afford to pay Reynolds more money. *Id.* at 120.[7] At the end of February 2001, employee Lynn Collins came to Watkins and told him that Reynolds had stated that he and employee Billy Stewart were going to leave Ronnie Watkins Ford to go work for a shop run by Darrin Vansandt if they did not get a raise. *Id.* at 72-73, 110, 114-15. Watkins asked Billy Stewart if he had any such intention, and Stewart explicitly denied it. *Id.*[8] Watkins also contacted Darrin Vansandt, who denied that he had any intention of hiring Reynolds. *Id.* at 121.

Defendants contend that, based on this information, Watkins concluded that Reynolds had lied to them. *See* Def. Ex. 4 at ¶ 3. Watkins also concluded that Reynolds statements were having an adverse impact on the company. *Id.* On March 1, 2001, Watkins made the decision to terminate Reynolds. Watkins contends that this decision was made based on Reynolds having

---

[7]Reynolds admits that he was paid as much as other employees in the detail shop. *See* Def. Ex.1 at 101.

[8]As will be discussed below, there is some dispute as to how these events took place.

lied to him and on the prior problems with Reynolds' employment. *Id.* Watkins asserts that at the time he made the decision to terminate Reynolds, he had no knowledge of the incident the day or two before regarding the toboggan. *See* Def. Ex. 4 at ¶ 4. Watkins contends that he never received a complaint from Reynolds or anyone else about such an event. *Id.*; Def. Ex. 5 at ¶ 4.[9]

After Reynolds was terminated, he was replaced by Billy Horton, who is also African American. *See* Def. Ex. 4 at ¶ 5; Def. Ex. 5 at ¶ 5. Reynolds has now opened his own detail shop, and is making more than he made at Ronnie Watkins Ford. *See* Def. Ex. 1 at 112. Reynolds has stated that he has no desire to return to Ronnie Watkins Ford. *Id.*

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings, discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477 U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000) (quotation omitted). The non-moving party then bears the burden of pointing to specific facts demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-

---

[9]Defendants also point out the fact that the Alabama Department of Industrial Relations determined that Reynolds was not entitled to unemployment benefits because he had been dismissed for work misconduct. *See* Def. Ex. 1 at 103-04. Reynolds also filed a charge with the EEOC, which determined that it "was unable to conclude that the information obtained establishes a violation of the statutes." *Id.* at 109-10, depo. exhibit 5. However, the EEOC also stated that "This does not certify that the respondent is in compliance with the statutes."

moving party "must either point to evidence in the record or present additional evidence 'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted). Summary judgment is required where the non-moving party merely repeats its conclusory allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay*, 265 F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. Proper Party Defendants

In their initial Motion, defendants argue that neither Watkins nor Ronnie Watkins d/b/a Ronnie Watkins Ford is subject to suit under Title VII or § 1981.[10]

#### A. Ronnie Watkins d/b/a Ronnie Watkins Ford

Defendants argue that the proper name for the car dealership is Ronnie Watkins Ford, Inc., a corporation licensed to do business in Alabama. *See* Compl. at ¶ 3. By contrast, Ronnie

---

[10]After defendants filed their original Motion, the court entered a scheduling order requiring Reynolds to succinctly list all of his claims. Reynolds' submission complied with that order, but did not address the arguments made by defendants with regards to who the proper defendants are in this case.

Watkins d/b/a Ronnie Watkins Ford is not a legal entity subject to suit. While Watkins is the

president of Ronnie Watkins Ford, Inc., defendants argue, he may not be sued as the corporation

for the corporation's actions. To hold otherwise would defeat one of the basic purposes of

incorporation.

    B.  Ronnie Watkins Individually

Defendants argue that the Eleventh Circuit has long held that there is no individual

liability under Title VII. *See Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)

(holding that "the relief granted under Title VII is against the employer, not individual

employees whose actions would constitute a violation of the Act"). Thus, the proper defendant

is Ronnie Watkins Ford, Inc., not Watkins individually.

## II. The Merits

### Claim One: Hostile Work Environment - Reynolds Subjected to Racial Slurs

    A.  Plaintiff's Position

Reynolds argues that the following caused and/or subjected him to a hostile work

environment: (1) the failure to implement a standard, effective policy regarding discrimination,

(2) the failure to ensure that all employees received a copy of the ineffective policy that was in

effect at the time of the four incidents, (3) the failure to investigate thoroughly and effectively

complaints of harassment made by or on the behalf of Reynolds, and (4) the failure to discover

discriminatory harassment by co-employees toward Reynolds.

Specifically, Reynolds notes, although there was an employee manual that contained a

basic anti-discrimination clause, he never received a copy of that policy. *See* Pl. Ex. 2 at 52-53.

There is also no evidence that any employees or supervisory personnel ever received or even

read the manual.  Watkins testified that he had no way of knowing which employees had read the manual and which had not, because the form that an employee signed upon receipt of the handbook was not consistently kept.  *See* Pl. Ex. 1 at 49-52.  Reynolds also notes that Watkins admitted that he "wasn't sure" if the employment signs posted on the premises addressed discrimination, and he admitted that Ronnie Watkins Ford never conducted any kind of training regarding harassment.  *See* Pl. Ex. 1 at 53-55.

As to the specific incidents, Reynolds notes that the first incident was severe enough for Kenny Noojin to come up to him and apologize for the remark, and that the second and third incidents were severe enough to cause him to leave the employee party early, a fact that Watkins knew.  Moreover, Reynolds contends, there is no evidence that the first incident was ever investigated.  As to the second incident, while Watkins talked to Franklin and Baugh, there is no evidence that those two employees ever had anything documented in their file, although Reynolds did.  With the third incident, Watkins spoke with Rawles, but admitted that he did not take any statements regarding the incident until after the EEOC investigation had begun.

Finally, as to the fourth incident, Cornelius testified that such a comment would have violated the company anti-discrimination policy.  *See* Pl. Ex. 3 at 29-32.  However, Cornelius was not aware of any type of investigation, or whether Baugh had received any kind of reprimand.  *Id.* at 29-32.  While Watkins contends that he did not know about the fourth incident until after Reynolds was terminated, he admitted that he did not conduct an investigation of the event until after the EEOC had begun its investigation.  *See* Pl. Ex. 1 at 69-72.  Ultimately, Reynolds argues, the facts demonstrate that defendants did not have an effective company policy regarding discrimination and that they failed to take any action that would prevent future

12

incidents.

B. Defendants' Response

Defendants point to several facts to dispute Reynolds' claim. As to the first incident, they note that Reynolds did not complain to Watkins or any other supervisory employee about the comments, and that Reynolds subsequently wrote a letter to Watkins indicating that he enjoyed working at Ronnie Watkins Ford. Defendants also argue that it is undisputed that there was an employee manual at Ronnie Watkins Ford, and that Baugh received a copy of the handbook and agreed to abide by it. *See* Cornelius Supp. Decl. at ¶ 4. As to incident two, Reynolds also did not complain, but once Watkins found out about it, defendants argue, he talked with Franklin and Baugh about the incident and told them that their actions would not be tolerated and could result in termination. *See* Def. Ex. 2 at 64-65.

As to the third incident, defendants note, Reynolds did not include this incident in his complaint or in his EEOC charge. Indeed, when asked about the alleged racial slurs during his deposition, Reynolds on at least two occasions failed to include this incident in his list of complaints. *See* Def. Ex. 1 at 64-67, 92, 106. Therefore, defendants argue, he cannot now include this incident in an attempt to avoid summary judgment. Moreover, defendants contend, the evidence itself, an African American employee, who is bald, wearing an "Afro" wig to party, is not indicative of race discrimination. Defendants also note that as soon as Watkins learned about the incident, he sent for Reynolds to discuss it with him.

As to the fourth incident, defendants argue, Watkins had already made the decision to terminate Reynolds before he had ever even heard about the incident. Watkins had even told Cornelius that he was going to terminate Reynolds. *See* Def. Ex. 4 at ¶ 4; Ex. 5 at ¶ 3. The sole

13

reason that Watkins sent for Reynolds was so that the latter could be terminated. Reynolds

concedes that he knew that Watkins wanted to see him about something. *See* Def. Ex. 1 at 109.

Prior to this meeting, defendants contend, Watkins had no knowledge of the last incident

involving the toboggan, and Reynolds had not complained about the incident.

Defendants concede that Title VII is violated when the workplace is "permeated with

discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive enough to

alter the conditions of the victim's employment and create an abusive working environment."

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and quotation marks omitted).

However, to support this claim, Reynolds must show that defendants' actions created an

"*objectively* abusive and hostile atmosphere." *See Edwards v. Wallace Cmty. Coll.*, 49 F.3d

1517, 1521 (11th Cir. 1995) (citations omitted) (emphasis added). Factors to be considered

include "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the

conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether

the conduct unreasonably interferes with the employee's job performance." *Gupta v. Fla. Bd. of

Regents*, 212 F.3d 571, 584 (11th Cir. 2000).

Defendants also note that in order to maintain a hostile work environment claim based on

racial animus, racial slurs must be so "commonplace, overt and digenerating that they create[] an

atmosphere charged with racial hostility." *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067,

1068 (11th Cir. 1990). In other words, "simple teasing, offhand comments, and isolated

incidents will not amount to discriminatory changes in the terms and conditions of employment."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Here, defendants argue, Reynolds

simply has not demonstrated that he was subjected to a hostile work environment.

14

### C. Plaintiff's Reply

Reynolds again notes that, as to the first incident, he thought that Chris Stewart, who heard the comment at issue, was a supervisor. Therefore, he reasonably felt that he did not have to report the incident. Reynolds also notes that it is undisputed that Kenny Noojin apologized to him about the incident, but, Reynolds contends, there is no evidence that Noojin had ever read the company policy regarding discrimination or had any training on such issues. As to the second and third incidents, Reynolds notes, Watkins was at the party where these events took place.

## Claim Two: Disparate Impact/Treatment - Reynolds' Termination

### A. Plaintiff's Position

Reynolds contends that he was fired solely because he was African American, and that he was replaced by Charles Reavis, and Caucasian employee. As noted above, he points to the fact that Horton, who defendants contend replaced Reynolds, was hired as a "manager-clean up," and that he was hired prior to the date that Reynolds was terminated.

### B. Defendants' Response

Defendants point to the declarations of Watkins and Cornelius which state that Reynolds was replaced by Horton, who is African American. *See* Def. Ex. 4 at ¶ 5; Ex. 5 at ¶ 5. Defendants contend that Horton replaced Reynolds, and then later was promoted to fill the position vacated by Malone's termination.[11] Reynolds himself, defendants note, admitted that when he was terminated, no one had filled Malone's vacant position. *See* Def. Ex. 1 at 49. Defendants argue that this claim must fail because Reynolds has failed to demonstrate that he

---

[11]Reynolds contends that this assertion, found in Def. Ex. 4, conflicts with Watkins prior deposition testimony and should be stricken.

was replaced by someone outside his protected class or suffered from disparate treatment

because of his membership in a protected class. *See Kelliher v. Veneman*, 313 F.3d 1270, 1275

(11th Cir. 2002) (listing elements of a *prima facie* case).

### C. Plaintiff's Reply

In addition to his original arguments, Reynolds filed an affidavit in which he states that

Horton was working in the clean-up department while Reynolds was still employed at Ronnie

Watkins Ford. *See* Reply Ex. 1 at ¶ 2.[12]

## Claim Three: Disparate Impact/Treatment - Maintaining Employee Database

### A. Plaintiff's Position

Reynolds argues that maintaining the employee database, which contained the race of all

the employees at Ronnie Watkins Ford, is a discriminatory practice on its face. Reynolds also

disputes that any forms exist that must be supplied to the State of Alabama that would require

such information.

### B. Defendants' Response

First, defendants note, the exhibit that Reynolds points to was derived from a database at

the specific request of the EEOC. *See* Def. Ex. 3 at 60-61. Moreover, the database itself is kept

so that Ronnie Watkins Ford can fill out certain forms that are required by the State of Alabama.

*Id.* at 63. Finally, defendants argue, a plaintiff must demonstrate, as part of his *prima facie case*,

that he suffered some type of "adverse employment action." *Davis v. Town of Lake Park*, 245

F.3d 1232, 1238 (11th Cir. 2001). Here, Reynolds has not demonstrated how this exhibit and/or

database resulted in an adverse employment action. Indeed, defendants assert, Reynolds has not

---

[12]Defendants have filed a Motion to Strike this affidavit, arguing that it conflicts with Reynolds' sworn deposition testimony. *See* Def. Ex. 1 at 46-48.

16

even alleged that the document was used to affect his employment. It is undisputed that defendants were aware of Reynolds' race.

    C. Plaintiff's Reply

    Reynolds, after making his initial arguments, contends that defendants rely upon a person's race in making hiring decisions. He contends that defendants maintain a set quota of black employees to cloud the appearance of discrimination.

**Claim Four: Disparate Impact/Treatment - Enforcement of Employee Handbook**

    A. Plaintiff's Position

    Reynolds argues that defendants discriminated against him by failing to give him a warning about his "lying" prior to his termination. Watkins testified that the primary reason for his terminating Reynolds was the alleged lie concerning Billy Stewart. However, Reynolds notes, Watkins also testified that employees normally are given a verbal reprimand, but that Reynolds had never been given a verbal warning about making false statements.[13] While Watkins testified that Reynolds had been warned about the job interview with the postal service, Watkins also testified that the incident did not bother him at the time, and that it happened over a year prior to Reynolds' termination.

    Reynolds also argues that there is conflicting evidence surrounding the reason for his discharge and the circumstances surrounding his discharge, thereby creating an inference of racial discrimination and pretext. First, Watkins testified that Reynolds had approached him to discuss that Reynolds and Billy Stewart were leaving. *See* Pl. Ex. 1 at 72-74. Watkins later

---

[13]Reynolds also argues that a proper investigation would have revealed that he was not lying, noting that Stewart did in fact ultimately leave Ronnie Watkins Ford to go work at another detail shop. *See* Pl. Ex. 1 at 153-58. Reynolds contends that there was no reason to believe Billy Stewart over him.

testified that employee Lynn Collins came to him and told him about Reynolds and Billy Stewart, and that he then sent for Reynolds to discuss the issue. *Id.* at 114-15. However, in the entry placed into Reynolds' employee file, Watkins stated that he spoke with Billy Stewart himself, and then later spoke with Darrin Vansandt and Reynolds. *Id.* at depo. exhibit 4.

Reynolds also points to the fact that Cornelius testified that Watkins never gave him a specific reason for terminating Reynolds, and that it was unusual for Watkins to terminate someone without telling him the reason why. *See* Pl. Ex. 3 at 31-35, 43. Of the six employee terminations that Cornelius participated in, Reynolds contends, Reynolds' was the only one in which Cornelius did not know the exact reason why the employee was terminated. *Id.* at 53. Cornelius also testified that Watkins did not give a specific reason for termination to Reynolds, instead telling him that "it was in the best interest of the company that we separate." *Id.* at 35.

In summary, Reynolds argues, the reason given by defendants for his termination was pretextual, and that he was in fact fired because of his race and his complaints to management about racial slurs. He further asserts that he was the only employee terminated for making false statements in violation of the employee handbook.

B. Defendants' Response

While acknowledging that no other employee has been discharged for violating the same policy that Reynolds violated, defendants argue, no other employee has committed acts substantially similar to those committed by Reynolds. *See* Def. Ex. 4 at ¶ 5; Ex. 5 at ¶ 5. Defendants note that in order to make out a *prima facie* case, "the plaintiff must show that he and the [other] employees are similarly situated in all relevant respects. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). This requires that the court "consider whether the employees are

18

involved in or accused of the same of similar conduct and are disciplined in different ways." *Id.* at 1562.

As for the "inconsistences" in how Watkins learned that Reynolds had lied about Billy Stewart, defendants argue that they are of no consequence to this motion.  The undisputed fact remains that Lynn Collins told Watkins that Reynolds threatened that he and Billy Stewart were leaving if they did not get a raise.  Watkins investigated that claim, defendants argue, and determined that Billy Stewart had made no such assertion.  Thus, Watkins concluded that Reynolds was lying and decided to terminate him.

Defendants note, in addition to the general law regarding burden of proof and pretext, that "even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).  Defendants also point out the fact that, as noted above, Reynolds had been involved in some incidents prior to the events at issue.  They also note that it was Watkins that hired Reynolds in the first place.[14]  *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'") (citations omitted).

Finally, defendants address Reynolds' assertion that he was only one of three African American employees out of a workforce of 45.  First, defendants note, no such assertion is made in the EEOC charge or the complaint.  Moreover, as the Eleventh Circuit has noted,

---

[14]Defendants also point to the determinations of the EEOC and the Alabama Department of Industrial Relations.

> A disparate impact claim under Title VII charges that a facially neutral practice or test of the employer led to a discriminatory impact on a particular group and that the test or practice cannot be justified as a business necessity. . . . A plaintiff must identify a specific employment practice that leads to the disparate impact. . . . A plaintiff also must make a comparison of the racial composition of persons in the labor pool qualified for the position at issue with those persons actually holding that position, and he/she must demonstrate that the allegedly discriminatory practice or test is connected to the disparate impact.

*Edwards*, 49 F.3d at 1520 (citations omitted).  Reynolds, defendants argue, has made no such showing.

### C.  Plaintiff's Reply

Reynolds contends that it was the taking of and relying on the statements of Billy Stewart that constituted the disparate treatment.  Reynolds argues that there was no reason to believe Billy Stewart over him, other than on the basis of race.  In other words, even if Watkins stated reason for terminating Reynolds is true, Reynolds was nonetheless subjected to discrimination in the treatment of the conflicting statements.

## Claim Five: Disparate Impact/Treatment - Placing a "Write-Up" In Reynolds' File

### A.  Plaintiff's Position

Reynolds argues that the defendants arbitrarily applied the disciplinary procedures and enforced the employee handbook based on his race.  Specifically, he notes that while the incidents alleged to have occurred at the employee party were documented as a "write-up" in his file, there is no evidence that they were documented in the files of the Caucasian employees.  Moreover, Watkins testified that Franklin still worked for the company, and that while Baugh no longer worked for Ronnie Watkins Ford, he was not terminated because of these events.  *See* Pl. Ex. 1 at 88.  However, Reynolds argues, he was terminated for complaining about the events in question.

B. Defendants' Response

Defendants argue that the entry, which they contend is not a "write-up," was written by

Watkins in preparation for the EEOC investigation and this litigation.  Again, defendants note, a

plaintiff must demonstrate, as part of his *prima facie case*, that he suffered some type of "adverse

employment action."  *Davis*, 245 F.3d at 1239.  Moreover, "the employee's subjective view of

the significance and adversity of the employer's action is not controlling; the employment action

must be materially adverse as viewed by a reasonable person in the circumstances."  *Id.*

Defendants further quote from *Davis* to show why this claim is not actionable:

> First, Davis relies upon the negative job performance memoranda placed in his
> file. Neither of the memos at issue caused him any present or foreseeable future
> economic injury; he maintains, however, that these memoranda were
> unwarranted, diminished his prestige and self-esteem, and potentially may
> interfere with (unspecified and unexplored) future job prospects. . . . Congress
> simply did not intend for Title VII to be implicated where so comparatively little
> is at stake.

*Id.* at 1240.

**Claim Six: Retaliation - Termination for Complaining About Racial Slurs**

A. Plaintiff's Position

Reynolds argues that he was terminated immediately after complaining to Watkins about

the racial slurs in question, specifically the incident involving the toboggan.  Reynolds argues

that he or someone on his behalf reported all four incidents to defendants.  However, as soon as

Reynolds approached Watkins about the toboggan incident, he was discharged.

B. Defendant's Response

Defendant notes that to establish a *prima facie* case of retaliation, a plaintiff must show

that "(1) he engaged in statutorily protected expression; (2) he suffered an adverse employment

21

action; and (3) there is some causal relation between the two events." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  However, to qualify for protection under the anti-retaliation provision, defendants argue, "the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable." *Rollins v. Florida Dep't of Law Enforcement*, 868 F.2d 397, 401 (11th Cir. 1989).  Reasonableness is determined "on a case by case basis by balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Id.* at 401.  Here, defendants argue, Reynolds never complained about any of the first three alleged racial slurs, and thus his conduct cannot be seen as reasonable.  As to the fourth incident, defendants contend, Watkins had already made the decision to terminate Reynolds before he learned about the incident. *See Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1207 (11th Cir. 2001) (noting that [a] decision maker cannot have been motivated to retaliate by something unknown to him").

**Claim Seven: Retaliation - Altering Reynolds' Employee File After Discharge**

    A.  Plaintiff's Position

       Reynolds argues that Watkins retaliated against him by altering an entry in his employee file after he complained to the EEOC.  Watkins acknowledged that he had created an entry in Reynolds' file immediately after he was terminated.  However, he also admitted that he added negative information to the report once he learned that the EEOC was conducting an investigation into Reynolds' allegations.  Reynolds argues that, even assuming Watkins had decided to fire him prior to the meeting between the two, retaining the employee file and altering

the contents of it gave defendants a method of retaliating against him, because future employers may contact defendants for information concerning Reynolds.  Reynolds also notes that the entry, even the unaltered version, contains information that made him appear to be a troublesome employee, even though some of the events, such as leaving to interview with the postal service, did not bother defendants at the time they occurred.

     B. Defendants' Response

Again, defendants note, even assuming that this alleged conduct is true, a plaintiff must demonstrate, as part of his *prima facie case*, that he suffered some type of "adverse employment action." *Davis*, 245 F.3d at 1239.  Reynolds has not done so.

### CONCLUSIONS OF THE COURT

The complaint in this case presents the typical shotgun litany of claims, often criticized by Eleventh Circuit courts.[15]  This court will give brief consideration to some of the claims.

First, there is no basis for any disparate impact claim.  There is no evidence of any alleged neutral practice which has resulted in a disparate impact.

Second, the plaintiff has cited no authority for the proposition that he can pursue a claim based upon the maintenance of racial employment data.  If the plaintiff can provide controlling authority in this regard, within fifteen (15) days, the court will re-visit the issue.

Perhaps less obviously non-meritorious is the discriminatory termination claim.  The defendants articulated a non-discriminatory reason for terminating the plaintiff's job.  Other than perhaps to suggest that the termination was in retaliation for his complaints, the plaintiff has offered no substantial evidence of discrimination.  The fact that the decision may have been in

---

[15]Some of the "claims" are not made in the plaintiff's complaint, either specifically or generally.  They only surfaced in response to defendants' motion.

retaliation for the complaints made by the plaintiff does not establish that the decision was made based on the plaintiff's race as opposed to his complaints. If the plaintiff can provide the court with a controlling case to the contrary, within fifteen (15) days, the court will re-visit the issue.

The hostile environment claim likewise lacks merit. The isolated incidents do not rise to the required level of severity. There is no evidence that plaintiff made a significant issue of the alleged incidents until the date of his termination. His November 2000 letter belies the suggestion that the conduct was pervasive enough to alter the conditions of plaintiff's employment or to interfere with his job performance.

The only claim of plaintiff which may have merit is his retaliation claim. The termination came shortly after plaintiff arguably made a complaint about racial slurs. There are factual issues as to whether the incident occurred. The court will deny the motion as to the retaliation claims.

Retaliation claims may be maintained under 42 U.S.C. § 1981. *See Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998); *see also Webster v. Fulton County*, 283 F.3d 1254 (11th Cir. 2002). While defendants are correct that the Title VII claim cannot be maintained against the individual defendant, apparently such claims may be maintained pursuant to 42 U.S.C. § 1981. *See, e.g., Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62 (2d Cir. 2000); *Sims v. KCA, Inc.*, 1994 WL 266744 (10th Cir. June 17, 1994); *Al-Khazraji v. Saint Francis College*, 784 F.2d 505 (3d Cir. 1986).[16]

---

[16]It is arguable that since § 1981 is premised on contractual relationships and the only contract was with the corporation, it should not apply to individuals. Apparently, the developing law is to the contrary. Another argument might be that it is not logical to allow such claims under § 1981, but not Title VII. Logic does not always apply.

This _____ day of February, 2003.

ROBERT B. PROPST
SENIOR UNITED STATES DISTRICT JUDGE